Circuitronix, LLC v. Kinwong Electric Hong Kong Company. Good morning, Mr. Sherker. May it please the court, Elliot Sherker on behalf of Kinwong. Kinwong's appeal is from the district court's ruling on our motion for partial judgment as a matter of law on our liability for sales to GM and Nissan, an alleged violation of the exclusivity provision of the party's 2010 and 2013 settlement documents. This is a question of contractual interpretation of the court of law. The two documents are in record 289-1 and 289-2. Under those documents, if Kinwong filled a CTX purchase order from one of several particular entities, including GM and Nissan, a two-year exclusivity provision was triggered during which Kinwong could not deal with that particular entity. It is undisputed that CTX placed no purchase orders from GM or Nissan. CTX placed orders from Lear for PCBs that would be used in seating systems ordered by GM and Nissan from Lear. As a matter of plain English, as we point out in our brief, from indicates a starting point of physical movement and for, on the other hand, is on behalf of. Lear was not placing purchase orders from GM or Nissan. The orders came from Lear, unlike another Lear customer, Leone, for which CTX actually placed purchase orders with Kinwong that were directly from Leone. Let me ask you something. So it seems to me that there was a, that the, the, the agreement clearly protected the direct relationship between Circuitronics and Lear. Yes, sir. And so under the covenant, Kinwong was not permitted to circumvent, attempt to circumvent, avoid, or bypass that relationship in any way. And Kinwong, it seemed to me, circumvented, avoided, and bypassed that relationship when it sold products to Lear's end clients directly instead of through Lear and Circuitronics. Our exclusivity relationship was with Lear because Lear placed a purchase order, the condition for exclusivity is the placement of a purchase order from. You don't get to the relationship until you have a purchase order from, there were no purchase orders from GM and Nissan. All the purchase orders were from Lear, which is why the exclusivity relationship was with Lear. We're not adverse to, to Lear on this, we're adverse to CTX, which is with GM and Nissan, and that exclusivity provision is only triggered by the placement of a purchase order from. Now, the way you get around, the way you deal with that, if you want to have a clause that provides protection is the way the parties dealt with Kimball, which was another entity with which there was an exclusive relationship. And as to Kimball, the agreement says there shall be no dealings with Kimball's customers, period. End of story, no conditions. If those are the protections that the, that CTX is attempting to say exist as the GM and Nissan without satisfying the precondition, I might, your honors, if there are no other questions on our appeal, I'd like to reserve the remainder of my time to add to my time on the, on responding to the cross appeal. Okay. Thank you, your honor. Mr. Rosenthal. Good morning. May it please the court. Steven Rosenthal on behalf of Circuitronics LLC, a Florida company, which the jury found was the victim of a systematic years long set of breaches by Ken Wong, a large Chinese circuit printed circuit board manufacturer. I would like to focus on the liquidated damages issue and on the merits of Mr. Shirker's argument and rely on our papers for the lost profits and untimeliness issues, unless the court has questions on those if I, let me start by responding directly to Mr. Shirker's points, and then I'll switch over to liquidated damages. If I may. I'm picking up specifically with several of the points that were just made. Um, with respect to the question of the word from in the contract, paragraph five of the covenant, not to circumvent. Um, we've briefed why that word is a broad word. Mr. Shirker used a word placement of a purchase order from that's in their brief, and he just reiterated that twice during argument, the word placed does not appear in the covenant, not to circumvent the only operative word is from, um, and it just a purchase order needs to just be from the listed entity. Mr. Shirker made several points about the types of listed entities that are on a revised schedule a to the settlement agreement. Um, it's undisputed that GM and Nissan are listed entities on the settlement. Yeah. Um, with respect to Leone, which is another one listed just below them. Um, just because Leone happened to deal directly in PCBs to Ken Wong through circuitronics doesn't mean that other, other customers cannot deal indirectly. So that doesn't disprove the reality of what everyone concedes happens here with GM and Nissan. Um, with respect to the fact that, uh, Kimball is listed separately in the settlement agreement covenant, not to circumvent end of paragraph five. It's important to keep in mind that that provision was created in 2010, but in 2013, the parties added revised schedule a, and that's the document that specifically listed GM and Nissan. And if you compare the original schedule a that at the back of the 2010 settlement agreement to the 2013 revision, you'll see that in the 2013 revision, the parties specifically listed and customers by name. So those exclusive customers were named and there is evidence. Should parole evidence be necessary to clarify this point? I don't think it is that, uh, in our brief at page 65 footnote 22, there is evidence as to why Kimball was specifically mentioned in the 2010. Uh, settlement agreement because circuitronics had caught them breaching the manufacturer's agreement, which proceeded the settlement agreement between 2005 and 2010. So there was a specific reason that Kimball was sort of emphasized there. Um, I think that takes care of the specific textual issues. The only one I would emphasize, um, other than what's pointed out at length in the breeze is that if indirectly transmitted purchase orders indirectly from GM and Nissan don't count, then what's the point of having listed them as exclusive customers in the settlement agreement, it would render their listing superfluous and judge sites in her order, uh, to documentary two 91 page four, recognize that point. So in conclusion, unless the court has questions on the substantive merits issue of, uh, Ken Wong's appeal, um, we would urge the court to affirm either on the ground of timeliness lack thereof, or frankly, the merits, which is the guts of it, which is that the court was correct in determining. Uh, that the contract does not limit whether the purchase order had to be directly from an end customer, but it could come indirectly from it. So I'll turn to the liquidated damages issue if I may. So circuitronics as a court to where we went to trial with its hands tied behind its back in a damages sense, because the district court prevented it from seeking its contractual remedy of liquidated damages, which these sophisticated parties freely bargained for. Given the complex nature of the international printed circuit board manufacturing business. It does seem to me they were unreasonably disproportionate and arguably a penalty. Well, let me, let me address that. Um, and I think that the district court was seized with the superficial distinction between the value on its face of a breach and the potential damages that would flow from it. And, and let me just go right to that grossly disproportionate point, uh, chief judge prior. The example of the judge on Garo, who was the judge through summary judgment up to just before trial, uh, because it had to get handed off due to a criminal case that intervened and chief, I mean, uh, senior judge sites tried the case. Um, she focused in her summary judgment order, which is documentary one 87 on, uh, Kinwong's admitted. Breach circumvention with respect to Lear of, and it had to do with the sale of a prototype part that was $764. Yeah, that's a breach, right? Yes. It's a disproportionate, disproportionate to that breach. So here's, here's the, uh, here's the deal as it's invoked to say these days. Um, so the $764 was for a prototype, which, uh, circuitronics asked Kinwong to build for it because circuitronics was trying to get a contract with Lear. The value of the contract with Lear was 10 million euros. The opinion says $10 million, but it's 10 million euros in the record. And what judge Ongaro said as well, 764 compared to 10 million. Um, you know, that doesn't matter because the liquidated damages provision was $2 million. So $2 million to $764, grossly disproportionate. The error here at summary judgment was ignoring the evidence about the nature of each project. Let me just tick through a few things and see if this addresses your concern to judge prior. So most of the breaches here are certainly for less than $10,000. The question is what are the breaches represent? And we submit that the evidence shows at summary judgment at a bare minimum, a genuine issue of material fact on the fact that they were the tip of an iceberg. In order to win a project. And Mr. Rishi Kukreja, the CEO of circuitronics testified to this in his deposition and in a, uh, an affidavit, which were in the record at summary to get a contract, you need to go through circuitronics needed to go through two to three years of work with the prospective customer. These are massive requirements contracts that take place over nine year spans and involve millions upon millions of print circuit boards, which get put into different subcomponents of various things for automakers and others. To, to, to get to that point, circuitronics had to spend significant sums of money to take the prospective customers to Kinwong's plants in China. In the case of Nissan, it was 28 separate trips over the course of three years before Nissan approved. And let a purchase order out. They would require a prototype, an initial constructed printed circuit board made to the specifications of the end user, very, uh, you know, detailed specific things. That was the $764 prototype at issue here. Had the prototype is like the doorway to the, to the hall. If you don't convince them that the prototype is a good one, they're not going to buy from that factory because this is a massive investment by the end. So the comparison is the appropriate comparison is what was the breach and what was the damage that flowed from the breach or would have flowed from the breach reasonably under the circumstances given this relationship. So it's not $764. It's the value to circuitronics of the loss of that contract. And in the fire, in the case, let me make sure I understand your argument. So based on the CEO's testimony and perhaps other evidence in the record, the loss is the business relationship. It's not limited to the loss, the loss profit from any individual piece of equipment. Is that right? And the business relationship would include things like loss of goodwill, loss of all the effort that you've been talking about that went into getting that customer. Is that right? That's correct. Your honor. So just to recapitulate, it's both the lost profit from the deal, plus other items that are not represented in that figure and basically there's, I would point the court to several pieces of evidence here that I think are critical to focus on with respect to the profit component, the evidence was that, for example, there were three projects that were lost due to Ken Ken Wong's refusal to honor pricing, the BDC project, the CMF one project, and the TMS three project, those projects were valued at more than a hundred million dollars. Circuitronics is profit. The testimony was would be 18 to $20 million from those. There was testimony that circuit on or just profit was net profit, 10%. So just taking the $20 million number, which is in the record at 10%, that's $2 million per. Okay. Then you look at things that are to judge Pryor's question, not represented in profit, the lost investment component. You have to look no further than the manufacturer's agreement itself, which says, and this is docket entry 48 dash one at paragraph six, that it's incorporated into the settlement agreement by a reference at paragraph nine, that King one quote acknowledges that circuitronics is expending substantial monies on advertising, marketing technology, and in the development of potential customers and accounts. And then you add to that the testimony about the extent to which over years long periods of time, circuitronics had to cultivate and induce these major purchasers to convince them that this Chinese factory was up to snuff and it was a massive expenditure. And then there's the relationship component. Um, and that Mr. Kukrija's deposition, uh, documentary one 40 dash one at one 78. He testified that damage to relationships with his customers are not accounted for in the last profits. And they could occur from acts like Ken Wong quote, refusing to accept purchase orders or changing agreed upon pricing, and those are subject to the liquidated damages provision. I know that was a long answer, but the point is that there was ample evidence in this record at summary judgment that would dispel judge Ungaro's concern about the disproportionality. Let me turn your attention to something that I think may be more relevant, which is that the district court abused its discretion when it barred circuitronics from seeking lost profit damages and interpreted rule 37, uh, which you concede your, um, client, um, violated, you know, it's just, it's, it's obligation to provide the computation. Um, but, but the district court interpreted the rule as mandating exclusion, uh, without engaging in a harmlessness inquiry and, and determining whether determining whether an other appropriate sanction would be warranted. It seems to me that that's, um, a misreading of the rule. Um, that, that, that the district court misread the rule and, um, and you should have made an inquiry about harmlessness and considered whether a lesser sanction was appropriate. Well, that's right. And I, this was a rather remarkable and unusual situation. If you step back and look at it, as you said, we conceded, I was not trial counsel, it was a different Mr. Rosenthal, but, um, you know, the defense rightly complained that we had not disclosed the calculation on lost profits. I'm not going to go back and waste time on excusing why that may not have been such a big deal because we'll concede that we have, um, but in response, we confessed to the court openly that we were using the simplest of calculations. And we were, we had to do so because there was no way to figure it out. Otherwise defendants own disclosed revenue figure, which they knew of course, and provided in their interrogatory response times circuit electronics as profit margin, which we also disclosed in Mr. Kukraja's deposition, the net profit margin was 10%. So while the simple calculation wasn't disclosed, and that's a technical violation of rule 26, it was elementary multiplication. So there was nothing that defendants did not know. And yet they sought the drastic sanction of barring the damages claim altogether. Understandably, it's a good strategic move, but our courts cases say that that's, uh, you know, not something that should be done. That usually arises in the, uh, 37 B context, rather than does it matter whether the district court first determines whether there was a harmlessness or, or is the district court obliged when the party moves forward to consider another appropriate section? Well, I'm not sure I understand the question. Well, so the, the, um, the rule says that if a party fails to provide the required information, the party is not allowed to use that information unless the failure was substantially justified or harmless, the next sentence says, in addition to, or instead of the sanction, the district court on motion and after giving an opportunity to be heard may impose other appropriate sanctions, right? So is, is that second part that is on motion, um, Triggered in any way by what comes before it, and that is, uh, a showing that the failure was substantially justified or harmless. I think it is. And I think that, well, we did make the harmlessness argument and, you know, the court overlooked that argument in our papers. And we put that in the brief. Of course it says in addition to, or, or instead of the sanction, it says in lieu of, I'm not sure that even you have to show the harmlessness, well, if another appropriate sanction before the district court considers whether there's another appropriate sanction, you make a reasonable point on this record, um, because we pointed out the harmlessness point and we think we can satisfy it. It may not be necessary to reach that question. The court's decision in Aztec. I realize time's up. So I'll just answer this and you're answering my questions. You're on my time. Okay. Thank you, your honor. You know, I would just point the court to the Aztec steel decision from this court in 1982, which said that, you know, consideration of whether a less drastic remedy that's equally effective could have fashioned been fashioned is a material consideration here for whether the court abused his discretion. And we would submit that the court did abuse its discretion. It's in our papers. And frankly, in this case, uh, you know, circuitronic was forced to go to trial. The jury found many breaches of the exclusivity agreement and the damages that we were able to obtain were simply out of pocket damages over a course of many years. There are orders of magnitude, uh, more damages that we were excluded from getting both because barring the lost profits at all. And because of the barring of liquidated damages. So we would urge the court to reverse and allow us the opportunity to, to go back and obtain fair compensation. Okay. Thank you, Mr. Ressenthal. Uh, we'll hear from Mr. Sharper. Hey, please record. I'll begin with the lost profits point. The district court expressly found at record one 90 plate page six at the disposal, not harmless because to allow plaintiff to present the evidence at trial, but the defendants, no ability to meaningfully respond either with contrary facts or with impeachment evidence and further that boat at this page of six through seven reopening discovery at this very late stage would further delay the case and impose on defendants of financial costs that they should not have to bear. We submit the district court correctly rejected CTX's post ruling efforts, which is really what Mr. Rosenthal is talking about this morning to avoid exclusion because CTX argued in the trough and the district court and argues here that it's essentially simple math. In other words, take our CEO's deposition testimony in which he refused to disclose his calculations of damages on, on the absurd basis that was protected by attorney client privilege and work product and refused to answer any Nonetheless, take his testimony on its face value at 10% of circumvention revenues, apply it to all the actual revenues. And there you have our lost profits. The district court specifically addressed that record to 17 page 13. The district court said that's not a calculation under rule 26, any that's saying, quote, this is our profit margin. This is what they said in discovery with the revenues. And then we're going to have some kind of extemporaneous calculation with the trial as to what the lost profits amount to. And that's not what rule 26 contemplates. And nor is it as simple as CTX makes it seem this morning, because seats, Mr. Kukrija testified that as to one of his projects, the profit margin was 30%, not 10% as record to 10 pages to 10 dash two page three CTX argued that it's correct to argue to the district court. That is correct. Profit margin on Kinbaum sales book is an issue of fact for the jury. There was no profit margin established as a matter of undisputed fact. They presented as an issue of fact to the jury, an issue of practice in which they provided no discovery at all. And only one month before the trial, CTX told the second judge that told the district court that the profit margin was either 18% or 22%. That's record two 33 page 23. When the court said, what's the number CTX as counsel responded, I can do the math here real quick. There was still no discovery. There was still no mathematical computation one month before trial. As the district court said, it was quote left wondering if the calculation really was so simple. Why didn't plaintiff just do it and provided it as rule 26 requires. CTX reply brief said that's going good, but we went to trial two months later. This is what the second judge had to say. Remember one month before trial, counsel was still prepared to do a mathematical calculation on the fly in front of the district court. The second district judge does sites rule. My concern, Mr. Sugar is that the district court interpreted this exclusion as, as automatic under the rule. There's a circuit split on that issue. Um, the first, fourth, eighth and ninth have concluded that the exclusion is either automatic or near automatic. The second, sixth and seventh circuits have concluded that the district court has the discretion to impose a lesser sanction. It seems to me the district court weighed in on one side of that circuit split in a way that we need to decide whether that was appropriate or not. Well, your honor, you have me at something of a disadvantage because the other side hasn't briefed any of that, uh, in its, in its papers. Before this currently preserve the issue, no question about it, but I refer to the committee note, which does say in so many words, this provides a long inducement for disclosure of material that the disclosing party would expect to use as evidence. That's my problem with that is that the, the, the rule itself though, says in addition to, or instead of this sanction, the district court on motion. And after giving an opportunity to be heard may impose other appropriate sanctions, correct your honor. And to the extent that the court can consider other sanctions, there was the ever to disclose a computation discovery closed. We had no opportunity to get expert testimony. We had no opportunity to look at his computations. There was nothing else for the district court to do because otherwise we were going to go to trial with what the district court called an extemporaneous calculation made on the standard trial on a varying number of topics with no, with no disclosure of how many sales they actually claimed they would have made. But for the, but for the alleged circumvention, and we would not know the figure until Mr. Kukrija who invoked the privilege at the, at his deposition and as, as the, as the plaintiff telling the district court in so many words, this is in record two, 10. Page eight record two, 10 page eight quote, there was no calculation of lost profits for CTX to disclose other than privileged discussions with counsel. That's what they told the district court. So we were never going to get any discovery out of the plaintiff on the question of lost profits. What else was the district court supposed to do under those circumstances? No other sanction could have allowed us to go to trial with any idea of what was going to come from the other side. This was a stonewall from day one. It was a stonewall in the initial disclosures. It was a stonewall in response to our damages interrogatories. It was a stonewall up until a month before trial, when it was still a discovery, there was nothing else for the district court to do. So even if the court were to suggest that the district court could have considered other sanctions, there's nothing else that would have made us whole there's nothing else that could have redressed this kind of deliberate stonewalling of the obligations under rule 26. I'd like to turn briefly to liquidated damages by Mike. And the only problem I have with that, Mr. Sugar, it's just, as it seemed to me that we're in the position to be making that inquiry, that decision first, if the district court's wrong about the exclusion being mandatory, it seems to me the one who's in the better position to make that determination is the district court. Judge, I think if you read the district court's rulings, both judges rulings, they gave the other side every opportunity to do something about its nondisclosure, and if we're going to defer to a district court's broad discretion, I think the district court's ruling, the two rulings on discretion, this case doesn't present the necessity for resolving exactly what rule 37 C1 might mean in some other case, this was zero discovery, zero computations, zero pieces of paper on what those computations were supposed to be on a deliberate stonewall from the beginning of the case. I think that under any circumstances, it wouldn't be an abuse of discretion to exclude the lost profits testimony. On the question of liquidated damages, I was listening with interest to Mr. Rosenthal's explication of all the different ways that damages might somehow amount to something that would make $2 million reasonable, and everything that he said, of course, addresses the first prong of the rule under Florida law, which is damages must not be reasonably ascertainable at the time of the contract, of all of these damages that Mr. Rosenthal was reciting, and I'm interested to note, your honors, that a lot of those damages were supposedly lost profits, which were never disclosed. So there was nothing in this record on which the court can make a determination as to lost profits would have been because of course, they were never disclosed, leaving that aside. All of that shows why damages were reasonably ascertainable at the time of the contract. As the district court essentially said, this is a contract to sell widgets. If you don't get to sell X number of widgets, you supposedly know without what your profits are going to be from not selling those widgets and the damages were reasonably ascertainable. So we don't even have to reach the question of whether it was disproportionate because the damages by Mr. Rosenthal's own admission here this morning were reasonably ascertainable at the time of the contract. Now, every contract, unless it's a requirements contract or installment contract is going to have consequential damages that parties might not anticipate at the time of the deal, but that's the parties here. The parties here were only doing about $3 million of total business each year when they entered into this agreement, right? That is entirely correct. And I think it's fair to say that there's no possible scenario under which $3 million of business is ever going to translate into hundreds of millions of dollars, over a hundred million dollars in damages. Each one of the deals is reflected in our discovery. We fully disclosed each deal where there was supposed circumvention in our discovery, and as your honor pointed out, most of them were no more than about $10,000 if the damage, the consequential damages were not were so readily understandable, then they don't satisfy the first one. And if they said that they reached the second problem, it was entirely fair, we submit for the district court to look at this $764 example. And you know why is because, because CTS itself threatened Kinlong every time there was a potential breach, whether it was a $2,000 breach, whether it was a $10,000 breach. The testimony from Mr. Cooperage was even if it was pennies, it's $2 million in liquidated damages, and that's what we're threatening with. They treated it as what Mr. Cooperage had called it in his testimony, a strong penalty to compel compliance with the contract. And that's the way they used it throughout the, throughout their view, their dealings with, with Kinlong was as a strong penalty. And if there's anything that Florida law prohibits, it's using a liquidated damages clause as a penalty to force compliance with the contract. So on, on the liquidated damages, the district court was eminently correct, applied Florida law as it, as it exists on its face, found that there was, the damages were reasonably ascertainable at the time of the contract, and even if they were not, that there's no Florida case law that upholds anything close to $2 million per breach as a valid liquidated damages, valid liquidated damages amount, the district court ruled correctly under Florida law. Thank you. Thank you, Mr. Shurker. We have your case.